## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| **LAWRENCE MAGEN,** )<br>)<br> **Plaintiff,** )<br>)<br> **v.** )<br>)<br>**ACORN MEDIA GROUP, INC.,** )<br>)<br> **Defendant** )<br>) | **Civil No.  11-CV-02719-MJD-FLN** |

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANT ACORN MEDIA GROUP, INC. FOR A PRELIMINARY INJUNCTION

Defendant Acorn Media Group, Inc. ("Acorn") moves this Court pursuant to Rule 65 of the Federal Rules of Civil Procedure for a preliminary injunction prohibiting Plaintiff Lawrence Magen from registering and using in bad faith the <acorn.tv> website and domain name in violation of Acorn's rights in two federally-registered trademarks.[1]

## BACKGROUND

Since 1998, Acorn has been using the Acorn name and the following trademarks in connection with the sale of various entertainment and media goods, including the distribution of prerecorded video programming, streaming video content, and the sale of various goods, including watches:

---

[1]     Contemporaneously herewith, Acorn has filed a Motion to Dismiss or Stay Proceedings (the "Motion to Dismiss") and a Motion to Confirm Arbitration Award (the "Motion to Confirm"), each of which are hereby expressly incorporated herein by reference.



**Acorn**Media

ACORN   Exceptional Entertainment
         Imaginative Gifts
         Uncommon Quality

Declaration of P. Andrew Torrez[2], Ex. B (Acorn Complaint to the National Arbitration

Forum) at 3 & Annexes A, B thereto.

Acorn registered the first mark (**Acorn**Media and the stylized acorn) with the

United States Patent and Trademark Office ("USPTO") on March 11, 2003 (Reg. No.

2,695,190), and the second mark (ACORN:  Exceptional Entertainment, Imaginative

Gifts, Uncommon Quality) with the USPTO on January 11, 2005 (Reg. No. 2,917,252).

Id.; see also id. Ex. E (Final Decision of National Arbitration Forum) at 6 (same).

Since 2001, Acorn has spent more than $60 million in advertising, marketing, and

other promotional efforts to build goodwill in the Acorn name and establish its

trademarks in order to identify Acorn products and distinguish those products from the

goods offered by Acorn's competitors.  Id. Ex. B at 4 & Annex D thereto.

Notwithstanding Acorn's long-standing use of  and investment in the Acorn name

and the registered trademarks identified above, in 2010, Mr. Magen began distributing

---

[2] Hereafter referred to as "Torrez Decl."

"low budget" video in the form of streaming online video entitled "Chillin' with Larry Magen" on the <acorn.tv> website. Id. Ex. E at 4. Mr. Magen also began using the <acorn.tv> website to sell watches. Id.

Concerned that its customers might come across Mr. Magen's "low budget" website and believe there is a relationship between the goods for sale there and Acorn's high-quality goods, Acorn filed a Complaint with the National Arbitration Forum (the "Forum") seeking a declaration that Mr. Magen's efforts to register and use the <acorn.tv> domain name were made in bad faith and infringed upon Acorn's prior trademarks, and requesting that the <acorn.tv> domain be transferred to Acorn. Id. Mr. Magen agreed to arbitrate the dispute regarding the <acorn.tv> domain name before the Forum and filed a Response to Acorn's Complaint on August 22, 2011. Id. at 2.

On September 9, 2011, the Forum ruled that (1) Mr. Magen's registration and use of the <acorn.tv> domain name was identical or confusingly similar to Acorn's trademarks; (2) that Mr. Magen had no rights or legitimate interests in respect of the <acorn.tv> domain name; and (3) that the <acorn.tv> domain name was registered and being used in bad faith. Id. at 6-14. The Forum's Final Decision thus ordered that the <acorn.tv> domain name be transferred to Acorn. Id. at 14.

Mr. Magen filed this lawsuit as a stratagem to postpone enforcement of the Forum's Final Decision with eNom.com. Complaint ¶ 18.[3] Acorn's motions to dismiss

---

[3]      Due to an apparent typographical error in Plaintiff's Complaint, Count I begins with a paragraph numbered "12," even though it is the nineteenth paragraph in the Complaint. There are thus two separate paragraphs in the Complaint numbered "12," "13," "14," and so on. To avoid confusion, citations within this pleading to a particular paragraph (e.g., Complaint ¶¶ 17-

the Complaint and to confirm the arbitration award  both are pending in this Court.

Mr. Magen continues to use the <acorn.tv> to offer its "low budget" "Chillin' with Larry Magen" program as well as to sell products similar to those offered for sale by Acorn.  Torrez Decl., Ex. G (accompanying screenshot of the <acorn.tv> website).  These activities constitute irreparable harm to Acorn.  In light of the Forum's arbitration decision, Mr. Magen's activities warrant injunctive relief prohibiting Mr. Magen from using the <acorn.tv> domain name until it can be transferred to Acorn, its rightful owner.

## I.     ACORN IS ENTITLED TO INJUNCTIVE RELIEF

In <u>Dataphase Sys., Inc. v. CL Sys., Inc.</u>, 640 F.2d 109, 113 (8th Cir. 1981), the Eighth Circuit instructed courts to consider the following four factors in awarding injunctive relief:  (1) the threat of irreparable harm to the moving party if an injunction is not granted, (2) the harm suffered by the moving party if injunctive relief is denied as compared to the effect on the non-moving party if the relief is granted, (3) the public interest, and (4) the probability that the moving party will succeed on the merits.  Each of these factors supports the awarding of a preliminary injunction to Acorn in the instant litigation.

Indeed, this Court has previously awarded precisely the sort of preliminary injunction that Acorn seeks here in order to prevent a party from capitalizing on another's legitimate trademarks in order to divert Internet traffic.  In <u>Faegre & Benson, LLP v.</u>

---

18; <u>see</u> <u>infra</u>) are to the first eighteen numbered paragraphs.  Citations to the nineteenth paragraph or later will be prefaced by a citation to either "Count I" or "Count II" and then the repeated paragraph number.

4

Purdy, 367 F.Supp.2d 1238 (D. Minn. 2005), this Court held that a preliminary injunction was necessary where the defendant was using invisible coded "metatags" on his website to divert individuals searching for plaintiff's protected trademarks to his website. Id. at 1240-41, 1246-47. The situation is considerably more dire in this case: Mr. Magen is not simply using invisible "metatags," he is using a domain that includes all of Acorn's protected trademark, adding only the top-level domain ".tv." As the National Arbitration Forum has concluded, this activity is virtually guaranteed to ensure that potential Acorn customers are instead diverted to Mr. Magen's site.

A close analysis of the Dataphase factors confirms that a preliminary injunction is at least as warranted here as in Faegre.

A.   Irreparable Harm

If Mr. Magen is permitted to continue using the <acorn.tv> website, Acorn will suffer irreparable harm in at least two ways:  (1) because some of Acorn's customers will or may become confused as between Acorn's current website and retail outlets and Mr. Magen's improper <acorn.tv> website; and (2) because Acorn may lose prospective customers searching for its products when those customers are diverted to Mr. Magen's "low budget" website instead. Each of these is well-established as the sort of irreparable harm justifying entry of a preliminary injunction.

1.   *Customer Confusion*

First, a showing that customer confusion is likely supports a "strong presumption of irreparable harm." Coca Cola Co. v. Purdy, 382 F.3d 774, 789 (8th Cir. 2004) (citing Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc., 815 F.2d 500, 505 (8th Cir.

3449769.1

1987)); see Fargo Electronics, Inc. v. Iris Ltd., Inc., 2005 WL 1431653, *7 (D.Minn. March 8, 2005) ("Customer confusion is a basis for irreparable harm.") (citing Hillerich & Bradsby Co. v. Christian Bros., Inc., 943 F.Supp. 1136, 1139 (D. Minn. 1996)); see also Calvin Klein Cosmetics Corp. v. Lenox Labs, Inc., 815 F.2d 500, 505 (8th Cir. 1987) (finding probable success of likelihood of confusion in trademark case gives rise to a presumption of irreparable injury); Church of Scientology Int'l v. Elmira Mission of Church of Scientology, 794 F.2d 38, 42 (2d Cir. 1986) (in trademark dispute context, "a finding of irreparable harm is automatic once the movant demonstrates unlawful use and consumer confusion.").

The Forum arbitrator has already found that the <acorn.tv> domain name "is confusingly similar with [Acorn's] trademark," Torrez Decl., Ex. E (Final Decision) at 5, in that it "reproduces the dominant part of the said trademark ACORN," and also adds the top-level domain ".tv" with "the clear intent to suggest television," a core component of Acorn's business. Id.; see also id. at 7-8 (noting that the .tv top-level domain "creates… more confusion in the mind of the average internet consumer as to [Acorn's] trademarks and the disputed domain name.").

Even if potential Acorn customers were to realize that the <acorn.tv> domain as currently operated by Mr. Magen is distinct from Acorn's legitimate online websites and retail outlets, the "initial confusion" caused by diverting Acorn customers to Mr. Magen's website first is sufficient to constitute irreparable harm. Faegre, 367 F.Supp.2d at 1246-47. As the Eighth Circuit has explained:

DOCS-#3592365-v2

3449769.1

> The fact that confusion about a website's source or
> sponsorship could be resolved by visiting the website is not
> relevant to whether the domain name itself is identical or
> confusingly similar to a plaintiff's mark. An example of this
> distinction is shown in <u>People for the Ethical Treatment of
> Animals v. Doughney [PETA]</u>, 263 F.3d 359 (4th Cir. 2001).
> There, the Fourth Circuit found <peta.org> confusingly
> similar to PETA's mark even though the attached website was
> a clear parody of the organization, for 'an internet user would
> not realize that they were not on an official PETA web site
> until after they had used PETA's Mark to access the web page
> "www.peta.org."' <u>Id.</u> at 366-67.

<u>Coca-Cola Co. v. Purdy</u>, <u>supra</u>, 382 F.3d at 783 (also citing <u>Virtual Works, Inc. v.

Volkswagen of America, Inc.</u>, 238 F.3d 264, 266 (4th Cir. 2001) (<vw.net> confusingly

similar to Volkswagen's "VW" trademark"); <u>Sporty's Farm LLC v. Sportsman's Market,

Inc.</u>, 202 F.3d 489, 497-98 (2d Cir. 2000) (<sportys.com> confusingly similar to

"Sporty's" trademark)); <u>see</u> <u>C.J. Products LLC v. Snuggly Plushez LLC</u>, ___ F.Supp.2d

____, 2011 WL 3667750, *21 (E.D.N.Y. Aug. 22, 2011) ("[I]n the website context,

courts have applied the doctrine of initial interest confusion, which posits that a

likelihood of confusion can arise when 'a consumer who searches for the plaintiff's

website with the aid of a search engine is directed instead to the defendant's site because

of a similarity in the parties' website address.' ... Thus even if the customer quickly

becomes aware of the competing source's actual identity and can rectify the mistake, the

damage to the first user may already have been done.") (internal citations omitted).

    2.    *Diversion, Loss of Prospective Customers, and Loss of Goodwill*

Intangible injuries -- such the loss of reputation or goodwill – are incapable of

measurement  and thus *per se* constitute irreparable harm.  <u>See</u>, <u>e.g.</u>, <u>Rent-A-Center, Inc.</u>

v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 607 (9th Cir. 1991). Similarly, courts have recognized that the potential loss of prospective customers also constitutes irreparable harm. See, e.g., Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001); Super-Krete Int'l, Inc. v. Sadleir, 2010 WL 1688533, *8 (C.D. Cal. Apr. 22, 2010) ("Plaintiff has demonstrated irreparable injury based on the threatened loss of prospective customers who would be diverted away from its website should it be unable to gain control over the domain name."). Applying these principles, this Court in Faegre held that the use of hidden "metatags" to purposefully divert internet consumers from a trademark holder's web sites constituted irreparable harm sufficient to justify the entry of a preliminary injunction. Faegre, 367 F.Supp.2d at 1246-47.

These sorts of harms are obviously present here. Indeed, the Forum arbitrator held that Mr. Magen was improperly using the <acorn.tv> domain name for the sale of the "same types of goods and services" as Acorn; namely, streaming video content and the sale of watches. Motion to Confirm, Ex. E (Final Decision) at 10, 11-12 ("The Panel finds that [Mr. Magen's] offering of the same types of goods and services under [Acorn's] mark disrupts [Acorn's] business by diverting potential customers and competing with [Acorn]." Put simply: every day that the <acorn.tv> website remains active with Mr. Magen's content continues to risk the diversion of legitimate Acorn customers to a competitor.

By his own admission, Mr. Magen's <acorn.tv> website is "low budget," see supra at 2-3. Acorn, by contrast, has spent in excess of $60 million to advertise, promote,

and market its professional, high-end Acorn brand, including the marks at issue here. Id. If diverted customers mistakenly confuse Mr. Magen's "low budget" site for a legitimate Acorn site, Acorn will suffer tarnishment and loss of goodwill to the marks that it has spent many millions of dollars promoting.

Thus, the first Dataphase factor strongly favors the entry of a preliminary injunction to protect Acorn against ongoing and irreparable harm.

B.     Balance of Harms

The second Dataphase factor asks this Court to balance the harms suffered by Acorn if injunctive relief is denied as compared to the effect on Mr. Magen if the relief is granted. Dataphase, 640 F.2d at 113. This factor also strongly favors the entry of a preliminary injunction.

The Forum has already determined that Mr. Magen lacks any right or legitimate interest in the <acorn.tv> domain name. Torrez Decl., Ex. E (Final Decision) at 8-11. Specifically, the Forum determined (1) that Mr. Magen is not authorized to use any Acorn trademark and is not a licensee of Acorn, id. at 8; (2) that Mr. Magen has no connection with the <acorn.tv> domain name, id.; (3) that Mr. Magen "is not commonly known by the disputed domain name and consequently lacks rights and legitimate interests." Id. at 9. Because Mr. Magen has no right or legitimate interest in the <acorn.tv> domain, the balance of harms axiomatically favors Acorn.

Moreover, even if this Court were to disregard the findings of the arbitrator and hold that Mr. Magen had some legitimate interest in the <acorn.tv> domain name, his business is by his own admission currently just a "low budget vehicle to allow for setting

up an infrastructure for future programming." Torrez Decl., Ex. E (Final Decision) at 4 (describing Mr. Magen's allegations in arbitration before the Forum).  By contrast, Acorn has an established business and has been using its marks in commerce since before 1999. Id. at 11.

This fundamental asymmetry – between Acorn's long-established business and Mr. Magen's "low budget infrastructure" – means that the balance of harms will always favor Acorn. An injunction that prevents an inactive website from becoming operational in the future is not a "harm" that warrants protection when balanced against a successful, long-established trademark.  See, Qassas v. Daylight Donut Flour Company, LLC, 2010 WL 2365472, *7 (N.D. Okla. June 10, 2010) ("A hypothetical risk that Avalon's website might become operational in the future is not sufficient to show a substantial likelihood of future copyright infringement or irreparable harm, and the Court will not enter an injunction against plaintiff based only on this hypothetical risk."). Accordingly, this second factor strongly favors the entry of a preliminary injunction.

C.    Public Interest

The third Dataphase factor asks this Court to consider whether the public interest will be served by the entry of a preliminary injunction. Dataphase, 640 F.2d at 113.  As with the first two factors, this factor also strongly favors the entry of a preliminary injunction.

Obviously, "the public interest is served by preventing customer confusion or deception." Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1321 (11th Cir. 2010); see Am. Dairy Queen Corp. v. New Line Prods., Inc., 35 F.Supp.2d 727, 737 (D. Minn. 1998)

3449769.1

(infringement of trademarks and unfair competition is inherently contrary to the public interest).

Specifically, Congress amended the Lanham Act in 1999 to prevent precisely the sort of conduct in which Mr. Magen has engaged here.  As the Eighth Circuit has noted:

> A number of cybersquatting problems prompted Congressional action. There was concern about individuals registering domain names that are similar to famous marks for the purpose of profiting by selling them to the legitimate owners of the marks.  See Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 238 (4th Cir. 2002). … Others attempted to divert unsuspecting consumers to their sites in order to engage in unfair competition.  … Conduct of this sort has been described as the "Internet version of a land grab." Interstellar Starship Servs., Ltd. v. Epix, Inc., 304 F.3d 936, 946 (9th Cir. 2002).
>
> The legislative history … includes findings that cybersquatters were engaging in consumer fraud and creating public confusion as to the true source or sponsorship of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable intellectual property.  S.Rep. No. 106-140, at *2 (findings). The Senate report included concerns about misleading users of the Internet: "[I]f someone is operating a web site under another brand owner's trademark, such as a site called 'cocacola.com' or 'levis.com,' consumers bear a significant risk of being deceived and defrauded, or at a minimum, confused."  Id. at *5.

Coca-Cola Co. v. Purdy, supra, 382 F.3d at 778.

The National Arbitration Forum held that Mr. Magen engaged in precisely this sort of "cybersquatting"; that is, Mr. Magen "registered the <acorn.tv> domain name specifically to take unfair advantage of the goodwill associated with [Acorn's] mark."

Torrez Decl., Ex. E (Final Decision) at 12.  As a result, the Forum held that Mr. Magen's attempts to register and use the <acorn.tv> website were in bad faith.  Id.  The public interest is thus served by restraining the continuing misuse of the <acorn.tv> domain name and website until it can be transferred to its rightful owner, Acorn.

      D.     Likelihood of Success on the Merits

The fourth and final Dataphase factor asks this Court to evaluate Acorn's likelihood of prevailing on the merits of its claim.  Here, the sole subject matter of Mr. Magen's Complaint – the proper ownership of the <acorn.tv> domain name – has already been the subject of binding arbitration before the National Arbitration Forum, and Acorn has moved to confirm the arbitration award and dismiss the Complaint.  See Defendant's Motion to Confirm and Defendant's Motion to Dismiss.  In his Complaint, Mr. Magen has utterly failed to allege any grounds pursuant to 9 U.S.C. 10 that provide a basis for vacating the arbitration award pursuant to 9 U.S.C. 10. Complaint, ¶¶ 10-11.

Accordingly – and particularly in light of the strong public policy in this Court and throughout the nation supporting arbitration – Acorn has demonstrated a strong likelihood that it will prevail on the merits of its claim of ownership of the <acorn.tv> domain name.  See, e.g., Wold v. Dell Fin. Svcs., L.P., 598 F.Supp.2d 984, 986 (D. Minn. 2009) (noting the "strong federal preference toward enforcing arbitration agreements" and citing, inter alia, Johnson v. Hubbard Broad., Inc., 940 F. Supp. 1447, 1453 (D. Minn. 1996)).

In any event, Acorn also can demonstrate a valid claim of trademark infringement under the Lanham Act by showing (1) ownership of a valid trademark, and (2) a

likelihood of confusion between the registered mark and the infringing use by Mr. Magen. See 3M v. Taylor, 21 F.Supp.2d 1003, 1004 (D. Minn. 1998). These facts are easily demonstrated; see supra at 2, 5-6.

## II.   CONCLUSION

For all of the foregoing reasons, Acorn has shown (1) that it will suffer irreparable harm absent a preliminary injunction, (2) that the balance of harms favors the entry of a preliminary injunction, (3) that the public interest is best served by the entry of a preliminary injunction, and (4) that it is overwhelmingly likely to prevail on the merits of its underlying claim to ownership of the <acorn.tv> domain name.   Accordingly, Acorn respectfully seeks the equitable relief of a preliminary injunction requiring Mr. Magen to take down its online content at <acorn.tv> and enjoining Mr. Magen from any further use of the <acorn.tv> domain name pending the confirmation of the underlying arbitration award and the transfer of the <acorn.tv> name to Acorn.

Dated: November 23, 2011

Respectfully submitted,

**LINDQUIST & VENNUM PLLP**

By:  s/ Bruce H. Little
Bruce H. Little (#17421x)
blittle@lindquist.com
Carrie Ryan Gallia (#0390479)
cryangallia@lindquist.com
4200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402-2274
(612) 371-3211
(612) 371-3207 (facsimile)

**ZUCKERMAN SPAEDER LLP**
P. Andrew Torrez (*pro hac vice* pending)
atorrez@zuckerman.com
100 East Pratt Street, Suite 2440
Baltimore, Maryland 21202
410-332-0444 (telephone)
410-659-0436 (facsimile)

**ATTORNEYS FOR DEFENDANT
ACORN MEDIA GROUP, INC.**